UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-80007-Cr-Middlebrooks/Matthewman

18 U.S.C. § 1349
26 U.S.C. § 7201
18 U.S.C. § 2
18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 982(a)(7)

UNITED STATES OF AMERICA

v.

MARC SPORN,

Defendant.
_____/

FILED BY ___TM___ D.C.

Feb 3, 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## INFORMATION

The United States Attorney charges that:

### GENERAL ALLEGATIONS

#### Medicare Program

1. The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

3. Medicare covered different types of benefits and were separated into different program "parts." Medicare "Part A" covered, among others, health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare "Part B" covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

4. Physicians, clinics, and other health care providers, including laboratories, that provided services to beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

5. A Medicare claim was required to contain certain important information, including: (a) the beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; (e) the name of the referring physician or other health care provider; and (f) the referring provider's unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form could be submitted in hard copy or electronically.

## Part B Coverage and Regulations

6. CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

7. Novitas Solutions Inc. ("Novitas") was the MAC for the consolidated Medicare jurisdictions that covered Louisiana, Mississippi, Oklahoma, Texas, and Pennsylvania. Palmetto GBA ("Palmetto") was the MAC for the consolidated Medicare jurisdictions that included Georgia, Alabama, Tennessee, South Carolina, North Carolina, Virginia, and West Virginia.

8. Payments under Medicare Part B were often made directly to the health care provider rather than to the patient or beneficiary. For this to occur, the beneficiary would assign the right of payment to the health care provider. Once such an assignment took place, the health care provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

## Cancer Genetic Tests

9. Cancer genetic ("CGx") testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. CGx testing was not a method of diagnosing whether an individual presently had cancer.

10. Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare

did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1). Among the statutory exceptions covered by Medicare were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

11. If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." *Id.* "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

12. Because CGx testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

**Telemedicine**

13. Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or telephone, to interact with a patient.

14. Telemedicine companies provided telemedicine or telehealth services to individuals by hiring doctors and other health care providers. Telemedicine companies typically

paid doctors a fee to conduct consultations with patients. In order to generate revenue, telemedicine companies typically either billed insurance or received payment from patients who utilized the services of the telemedicine company.

15. Medicare Part B covered expenses for specified telehealth services if certain requirements were met. These requirements included that (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was in a practitioner's office or a specified medical facility—not at a beneficiary's home—during the telehealth service with a remote practitioner.

## The Internal Revenue Service

16. The Internal Revenue Service ("IRS") was an agency of the United States Department of Treasury responsible for administering the federal tax laws of the United States and collecting taxes due and owing to the United States.

17. Corporations may elect to be an S corporation that passes corporate income, losses, deductions, and credits through to their shareholders for federal tax purposes. Shareholders of S corporations report the flow-through income and losses on their personal tax returns and are assessed at their individual income tax rates. Shareholders of C corporations report dividends and distributions on their individual income tax returns.

18. An IRS Form 1120-S, U.S. Corporation Income Tax Return for an S-Corporation, was an information return filed by an S Corporation to report, among other things, its income, gains, losses, deductions, and credits.

## The Defendant, Related Entities and Relevant Persons

19. Laboratory 1, a limited liability company formed under the laws of New Jersey, was a laboratory that purportedly provided CGx testing to beneficiaries.

20. Laboratory 2, a limited liability company formed under the laws of New Jersey, was a laboratory that purportedly provided CGx testing to beneficiaries.

21. LabSolutions, LLC ("LABSOLUTIONS"), a limited liability company formed under the laws of Georgia, was a laboratory that purportedly provided CGx testing to beneficiaries.

22. CPL Media Group, Inc. ("CPL"), a company incorporated under the laws of Florida, was a telemarking company.

23. Medipak, LLC ("MEDIPAK"), a limited liability company formed under the laws of Florida and doing business under the name CPL (CPL and MEDIPAK are collectively referred to herein as the "CPL ENTITIES"), was a telemarketing company.

24. Medtech Worldwide, Inc. ("MEDTECH"), a company incorporated under the laws of Florida, was a telemedicine company.

25. Real Time Physicians, LLC ("REAL TIME"), a limited liability company formed under the laws of Nevada, was a telemedicine company.

26. 24 HR Virtual MD, LLC ("24 HR"), a limited liability company formed under the laws of Florida, was a telemedicine company.

27. INS COV, LLC ("INS COV"), was a limited liability company formed under the laws of Florida.

28. Medi-Biotech, LLC ("MEDI-BIOTECH"), was a limited liability company formed under the laws of Florida.

29. Walmol Holdings, LLC ("WALMOL"), was a limited liability company formed under the laws of Florida.

30. Defendant **MARC SPORN**, a resident of Palm Beach County, Florida, was the owner, manager, and operator of the CPL ENTITIES, MEDTECH, REAL TIME, 24 HR, INS COV, MEDI-BIOTECH, and WALMOL.

## COUNT 1
### Conspiracy to Commit Health Care Fraud and Wire Fraud
### (18 U.S.C. § 1349)

1. Paragraphs 1 through 15, paragraphs 19 through 27, and paragraph 30 of the General Allegations section of this Information are re-alleged and incorporated by reference as though fully set forth herein.

2. From in or around January 2017, and continuing through in or around April 2021, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**MARC SPORN,**

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate and agree with Laboratory 1, Laboratory 2, LABSOLUTIONS, and others known and unknown to the United States Attorney, to commit offenses against the United States, that is:

    a. to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control

of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

        b.      to knowingly, and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, to knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

## Purpose of the Conspiracy

3.      It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (a) paying and receiving kickbacks in exchange for the referral of Medicare beneficiaries, CGx tests, and doctor's orders and other documentation necessary to submit claims to Medicare (collectively, "doctor's orders") to laboratories, including Laboratory 1, Laboratory 2, and LABSOLUTIONS, so that the laboratories could bill Medicare for CGx tests, without regard to whether the beneficiaries needed the tests or whether the tests were eligible for reimbursement; (b) paying kickbacks and bribes to telemedicine companies, including MEDTECH, in exchange for ordering and arranging for the ordering of CGx tests for beneficiaries, without regard to the medical necessity of the prescribed CGx tests or whether the tests were eligible for Medicare reimbursement; (c) submitting and causing the submission, via interstate wire communication, of false and fraudulent claims to Medicare for CGx tests that were not medically necessary and not eligible for reimbursement; (d) concealing the

submission of false and fraudulent claims to Medicare; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

## Manner and Means

The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things:

4.  **MARC SPORN** entered into an agreement to receive kickbacks and bribes as payments from laboratories, including Laboratory 1, Laboratory 2, and LABSOLUTIONS, to the CPL ENTITIES and INS COV for marketing services. In some of the contracts, the laboratories agreed to pay **SPORN**, through the CPL ENTITIES and INS COV, as much as 45% of the gross revenues paid by Medicare in exchange for his recruitment and referral of beneficiaries, CGx tests, and doctors' orders to the laboratories for CGx testing, regardless of whether the CGx tests were medically necessary or eligible for Medicare reimbursement.

5.  **MARC SPORN** and other co-conspirators, through the CPL ENTITIES, recruited thousands of Medicare beneficiaries by targeting them with telemarketing campaigns and inducing them to accept CGx tests regardless of whether the tests were medically necessary or eligible for Medicare reimbursement.

6.  **MARC SPORN** and other co-conspirators offered and paid illegal kickbacks and bribes to telemedicine companies, including MEDTECH, in exchange for doctor's orders for CGx tests that were not medically necessary and not eligible for Medicare reimbursement. The orders were written by doctors contracted with the telemedicine companies, including MEDTECH, REAL TIME, and 24 HR, even though those doctors had no prior relationship with the

beneficiaries, were not treating the beneficiaries for cancer or symptoms of cancer, did not use the test results in the treatment of the beneficiaries, and did not conduct a proper telemedicine visit.

7. **MARC SPORN** and other co-conspirators caused laboratories, including Laboratory 1, Laboratory 2, and LABSOLUTIONS, to submit false and fraudulent claims to Medicare, via interstate wire communications, for CGx tests that were: (a) induced through kickbacks and other illicit incentives; (b) designed for maximum reimbursement and regardless of medical need; (c) not medically necessary; (d) not eligible for reimbursement; and (e) not properly prescribed by a doctor (i) treating the beneficiary for cancer or symptoms of cancer, (ii) using the results in the treatment of the beneficiaries, or (iii) having a legitimate physician-patient relationship with the beneficiary.

8. As the result of these false and fraudulent claims, Medicare made payments to laboratories, including Laboratory 1, Laboratory 2, and LABSOLUTIONS. Laboratories, including Laboratory 1, Laboratory 2, and LABSOLUTIONS, then paid kickbacks to **MARC SPORN**, through the CPL ENTITIES and INS COV.

9. **MARC SPORN** and other co-conspirators used the fraud proceeds received from laboratories, including Laboratory 1, Laboratory 2, and LABSOLUTIONS, to benefit themselves and others, and to further the fraud.

All in violation of Title 18, United States Code, Section 1349.

### COUNT 2
### Tax Evasion
### (26 U.S.C. § 7201 and 18 U.S.C. § 2)

1. Paragraphs 16 through 18 and paragraphs 28 through 30 of the General Allegations section of this Information are re-alleged and incorporated by reference as though fully set forth

herein.

  2.  During the calendar year 2015, the Defendant,

**MARC SPORN,**

received taxable income upon which there was income tax due and owing to the United States of America. Knowing the foregoing facts and failing to make an income tax return on or before April 18, 2016, as required by law, to any proper officer of the Internal Revenue Service, and to pay the income tax to the Internal Revenue Service, **MARC SPORN**, from on or about January 2015 through on or about December 2015, in the Southern District of Florida and elsewhere, willfully attempted to evade and defeat income tax due and owing by him to the United States of America, for the calendar year 2015, by committing the following affirmative acts, among others:

  a)  on or about February 17, 2014, incorporating MEDI-BIOTECH through and in the name of nominee, M.L.;

  b)  on or about July 16, 2014, incorporating WALMOL through and in the name of nominee, M.L.;

  c)  on or about January 14, 2015, **MARC SPORN** concealed assets by using bank accounts in the names of nominee entities, including, but not limited to WALMOL, to purchase luxury items, such as a Rolex masterpiece watch for $45,000;

  d)  on or about March 25, 2015, **MARC SPORN** concealed assets by using bank accounts in the names of nominee entities, including, but not limited to, WALMOL, to purchase luxury items, such as the yacht, *MY Touchstone* for €680,000; and

e)  on or about April 15, 2015, **MARC SPORN** concealed assets by using bank accounts in the names of nominee entities, including, but not limited to, WALMOL, to purchase luxury items, such as the yacht, *MY RG 512* for €1,370,000.

In violation of Title 26, United States Code, Section 7201 and Title 18, United States Code, Section 2.

## FORFEITURE ALLEGATIONS

1. The allegations of this Information are hereby re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant, **MARC SPORN**, has an interest.

2. Upon conviction of a violation of Title 18, United States Code, Section 1349, as alleged in this Information, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(7).

3. If any of the property described above, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with a third party;
   c. has been placed beyond the jurisdiction of the court;
   d. has been substantially diminished in value; or
   e. has been co-mingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

All pursuant to Title 18, United States Code, Sections 982(a)(7) and 981(a)(1)(C), as incorporated by Title 28, United States Code, Section 2461(c), and the procedures set forth in Title 21, United States Code, Section 853, made applicable by Title 18, United States Code, Section 982(b)(1).

Date: 2/2/22          By: _____
                          JUAN ANTONIO GONZALEZ
                          UNITED STATES ATTORNEY
                          SOUTHERN DISTRICT OF FLORIDA

Date: 2/2/22          By: _____
                          JOSEPH S. BEEMSTERBOER
                          ACTING CHIEF
                          FRAUD SECTION, CRIMINAL DIVISION
                          U.S. DEPARTMENT OF JUSTICE

Date: 2/2/22          By: _____
                          LIGIA MARKMAN
                          TRIAL ATTORNEY
                          REGINALD CUYLER
                          TRIAL ATTORNEY
                          FRAUD SECTION, CRIMINAL DIVISION
                          U.S. DEPARTMENT OF JUSTICE

Date: 2/2/22          By: _____
                          AURORA FAGAN
                          ASSISTANT UNITED STATES ATTORNEY
                          UNITED STATES ATTORNEY'S OFFICE
                          SOUTHERN DISTRICT OF FLORIDA

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| UNITED STATES OF AMERICA | CASE NO. _____ |
|---|---|
| v. | |
| MARC SPORN | **CERTIFICATE OF TRIAL ATTORNEY*** |
| | **Superseding Case Information:** |
| Defendant/ | |

**Court Division:** (Select One)
☐ Miami ☐ Key West ☐ FTL
☑ WPB ☐ FTP

New defendant(s) ☐ Yes ☐ No
Number of new defendants _____
Total number of counts _____

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.
2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.
3. Interpreter: (Yes or No) **No**
   List language and/or dialect _____
4. This case will take 0.00 days for the parties to try.
5. Please check appropriate category and type of offense listed below:

   (Check only one)
   I   0 to 5 days      ☑
   II  6 to 10 days     ☐
   III 11 to 20 days    ☐
   IV  21 to 60 days    ☐
   V   61 days and over ☐

   (Check only one)
   Petty        ☐
   Minor        ☐
   Misdemeanor  ☐
   Felony       ☑

6. Has this case previously been filed in this District Court? (Yes or No) **No**
   If yes: Judge _____ Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter? (Yes or No) **No**
   If yes: Magistrate Case No. _____
   Related miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the District of _____
   Is this a potential death penalty case? (Yes or No) **No**

7. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia O. Valle)? (Yes or No) **No**
8. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)? (Yes or No) **No**
9. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)? (Yes or No) **No**

_[signature]_
Aurora Fagan
Assistant United States Attorney
FLA Bar No. 188591

*Penalty Sheet(s) attached                    REV 3/19/21

## aUNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:** MARC SPORN,

**Case No:**

Count 1:

Conspiracy to Commit Health Care Fraud and Wire Fraud

Title 18, United States Code, Section 1349

* **Max. Penalty:** 20 Years' Imprisonment, 3 years supervised release, and fine of up to $250,000.

---

Count 2:

Tax Evasion

Title 26, United States Code, Section 7201

* **Max. Penalty:** 5 Years' Imprisonment, 3 years supervised release, and fine of up to $100,000.

---

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: _____

## BOND RECOMMENDATION

DEFENDANT: MARC SPORN

$500,000 Personal Surety Bond

(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: _____
AUSA:   Aurora Fagan

Last Known Address: _____

_____

_____

What Facility: _____

_____

Agent(s): _____
(FBI)  (SECRET SERVICE)  (DEA)  (IRS)  (ICE)  (**OTHER**)

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
для the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| | ) | |
| MARC SPORN | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

David Garvin, Esq.
*Printed name of defendant's attorney*

_____
*Judge's signature*

U.S. Magistrate Judge
*Judge's printed name and title*